862 A.2d 996

**JANE DOE, et al.**

v.

**MARYLAND BOARD OF SOCIAL WORK EXAMINERS.**

**No. 18 Sept. Term., 2004.**

Court of Appeals of Maryland.

Dec. 9, 2004.

Timothy F. Maloney (Cary J. Hansel and Brian J. Markovitz of Joseph, Greenwald & Laake P.A., Greenbelt), on brief for petitioners.

Janet Klein Brown, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., of Maryland, Baltimore), on brief for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and GREENE, JJ.

CATHELL, Judge.

This case raises issues as to the extent of the privilege, and confidentiality of records, in respect to conversations between licensed social workers and their clients and the records of the social worker when there is an alleged unlawful failure on the part of the certified private social worker to report suspected child abuse by a client and the Board of Social Work Examiners thereafter seeks to subpoena the social worker's treatment records of clients pursuant to its investigation into the licensing of the social worker.

**166**

On or about July 20, 2001, the Board of Social Work Examiners (hereinafter "the Board"), received a complaint that Ms. F,[1] a licensed social worker,[2] had failed to report John Doe's suspected child abuse as required by law.[3] The complaint attached various newspaper articles referencing John Doe, a former client of Ms. F. According to the articles, John Doe was convicted in June 2001 of child abuse and third degree sex offenses involving his minor granddaughter. That abuse was not reported to the appropriate authorities by the licensed social worker.[4]

Obviously concerned with the social worker's failure to report the abuse, the Board initiated an investigation into the matter on September 25, 2001, and, as part of that investigation related to the licensing of the social worker, thereafter

---

1. Because the name of a licensed social worker is confidential while a Board investigation is in progress, we shall use this pseudonym when referring to the social worker.

2. According to the record, Ms. F is a "licensed certified social worker-clinical." *See* §§ 19–101(g) and 19–302(e) of the Health Occupations Article.

3. Md.Code (1984, 1999 Repl.Vol., 2004 Supp.), § 5–704 of the Family Law Article provides, in pertinent part:
 "**§ 5–704. Reporting of abuse or neglect—By health practitioner, police officer, educator or human service worker.**
 (a) *In general.*—Notwithstanding any other provision of law, including any law on privileged communications, each health practitioner, police officer, educator, or human service worker, acting in a professional capacity in this State:
 (1) (i) who has reason to believe that a child has been subjected to abuse, shall notify the local department or the appropriate law enforcement agency; or
 (ii) who has reason to believe that a child has been subjected to neglect, shall notify the local department; and
 (2) if acting as a staff member of a hospital, public health agency, child care institution, juvenile detention center, school, or similar institution, shall immediately notify and give all information required by this section to the head of the institution or the designee of the head."

4. According to the newspaper articles attached to the complaint, the abuse was not officially reported until the minor child advised her pediatrician of the abuse and he contacted the Department of Social Services.

issued a subpoena *duces tecum* to Ms. F, dated April 25, 2002, for the complete treatment records she had for the year 1998 of Jane and John Doe, petitioners, who were her clients. The purpose of the subpoena was to investigate the conduct of the social worker and not that of petitioners.

On May 9, 2002, in response to the subpoena, petitioners filed a "Motion to Seal Record" and a "Motion to Quash Subpoena" in the Circuit Court for Baltimore City. On August 23, 2002, the circuit court entered an Order granting petitioners' "Motion to Seal Record" but denying petitioners' "Motion to Quash Subpoena." On August 28, 2002, petitioners filed a "Notice of Intent to Appeal" the decision of the circuit court in regard to the motion to quash the subpoena. On October 1, 2002, the circuit court issued an Order granting a stay in the enforcement of the subpoena pending petitioners' appeal to the Court of Special Appeals.

On October 10, 2003, during the pendency of the appeal, and nearly a year-and-a-half after the subpoena was issued, the Board entered into a "Consent Order" with Ms. F. In the Consent Order, Ms. F agreed to be subjected to disciplinary measures by the Board for varying violations of Title 19 of the Health Occupations Article, including her failure to notify the appropriate authorities of specific suspected child abuse. The Consent Order, by its terms, recognized the pendency of petitioners' appeal and stated that the Board would not be precluded from taking further action against Ms. F if, after it obtained petitioners' treatment records via the subpoena, it found that Ms. F had committed *additional violations* of Title 19.[5]

On appeal, the intermediate appellate court affirmed the judgment of the circuit court, holding, after a thorough analysis, that petitioners "have neither a statutory nor a constitutional right to quash the subpoena at issue."[6] *Doe v. Mary-*

---

5. The pertinent language of this Consent Order, as well as the effect it has on petitioners' claims, is discussed, *infra*.

6. We shall examine the specific reasons for these holdings, *infra*.

*land Board of Social Workers,* 154 Md.App. 520, 542, 840 A.2d 744, 757 (2004).

Petitioners thereafter filed a Petition for Writ of Certiorari to this Court and on May 14, 2004, we granted the petition. *Doe v. Social Workers,* 381 Md. 324, 849 A.2d 473 (2004). In their brief, petitioners present two questions for our review:

"1. Whether the Court of Special Appeals incorrectly held that an administrative agency's subpoena, issued without cause, can overcome health care privileges expressly created by the legislature?

2. Whether the Court of Special Appeals incorrectly affirmed the Circuit Court's determination that the State's interest in obtaining Petitioners' therapy records outweighed Petitioners' constitutional privacy interest in preventing disclosure?"

We hold that where the Legislature has specifically provided a health agency such as the Board with the power to issue subpoenas for the purposes of investigating allegations that one of its licensees committed serious violations of her professional duties, the social worker—client privilege existing under Md.Code (1973, 1998 Repl.Vol.), § 9–121(b) of the Courts and Judicial Proceedings Article must yield to such an investigation. We further hold that petitioners' alleged constitutional privacy rights in the subpoenaed treatment records are not absolute. The interest of the public in having the conduct of a licensed social worker, accused of having violated her statutory duties, thoroughly investigated and, if appropriate, properly disciplined, outweighs the individual privacy interests of petitioners.

We shall affirm the judgment of the Court of Special Appeals.

### Discussion

*A.) Confidentiality and Social Worker—Client Privilege as they Relate to the Treatment Records*

Petitioners first ask this Court to decide whether a subpoena issued by the Board in order to investigate a complaint

against a licensed social worker for failure to report suspected child abuse overrides any statutory authority concerning confidential and/or privileged communications between the accused social worker and her clients, petitioners. In order to make a decision, we must first look to what the laws of this State provide in terms of privileged and confidential communications as they relate to social workers and their clients, as well as to any existing exceptions to those privileges.

Md.Code (1973, 1998 Repl.Vol.), § 9–121 of the Courts and Judicial Proceedings Article provides for a social worker—client *privilege* relating to communications made while the client was receiving counseling from the social worker. The statute provides, in pertinent part:

"**§ 9–121. Communications between licensed social worker and client.**

(a) *Definitions.*—(1) In this section, the following words have the meanings indicated.

(2) 'Client' means a person who communicates to or receives services from a licensed certified social worker regarding his mental or emotional condition, or from any other person participating directly or vitally with a licensed certified social worker in rendering those services, in consultation with or under direct supervision of a licensed certified social worker.

(3) 'Licensed, certified social worker' means any person licensed as a certified social worker under Title 19 of the Health Occupations Article.

(4) 'Witness' means a licensed certified social worker or any other person participating directly or vitally with a licensed certified social worker in rendering services to a client, in consultation with or under direct supervision of a licensed certified social worker.

(b) *Privilege established.—Unless otherwise provided,* in all judicial or administrative proceedings, a client has a privilege to refuse to disclose, and to prevent a witness from disclosing, communications made while the client was receiving counseling." [Emphasis added.]

■ This statute affords social workers and their clients similar protections that have long been applicable to other relationships where privacy issues and the need for open communication are of paramount importance, *e.g.*, marital privilege, attorney—client privilege, psychiatrist/psychologist—patient privilege, clergyman—communicant privilege, etc. The reasoning behind such privileges is obvious—the privileges provide for an environment in which open communication can occur without the fear that the communication will later be used in a court or administrative proceeding against the person making the communication. As can be seen from its passage of § 9–121 of the Courts and Judicial Proceedings Article, the Legislature was of the opinion that such an umbrella of privilege should also apply to the relationships between licensed social workers and their clients.[7]

Likewise, Md.Code (1982, 2000 Repl.Vol.), § 4–302 of the Health—General Article, which deals with the broader category of *confidentiality* of medical records, states, in pertinent part:

"§ 4–302. **Confidentiality and disclosure generally.**

(a) *In general.*—A health care provider[8] shall:

(1) Keep the medical record of a patient or recipient confidential; and

(2) Disclose the medical record only:

(i) As provided by this subtitle; or

---

7. The social worker—client privilege was first enacted in 1983 in Senate Bill 420. The Senate Judicial Proceedings Committee bill report states that "[t]his bill is intended to establish a privilege, which is designed to facilitate the free exchange of communication between social workers and their clients."

8. It is undisputed that a licensed social worker is to be considered a "health care provider" under § 4–301(h) of the Health—General Article, which states, in pertinent part:

"(h) *Health care provider.*—(1) 'Health care provider' means:

(i) A person who is licensed, certified, or otherwise authorized under the Health Occupations Article ... to provide health care in the ordinary course of business or practice of a profession or in an approved education or training program...."

(ii) As otherwise provided by law." [Footnote added.]

As can be seen after examining the statutes, the scope of the social worker—client privilege established under § 9-121(b) of the Courts and Judicial Proceedings Article is not identical to the scope of confidentiality of medical records established under § 4–302 of the Health—General Article. Section 4–302 makes confidential any information found in the "medical record," *i.e.*, any information that "[i]s entered in the record of a patient or recipient . . . [i]dentifies or can readily be associated with the identity of a patient or recipient; and . . . [r]elates to the health care of the patient or recipient." Section 4–301 of the Health–General Article (defining "medical record"). The social worker—client privilege of § 9–121(b) of the Courts and Judicial Proceedings Article, however, protects only those "communications made while the client was receiving counseling."

Because the treatment records relating to Ms. F's counseling services to petitioners were created pursuant to her "rendering services" to petitioners and they are undoubtedly to be considered medical records for the purposes of those statutes relating to the confidentiality of medical records, *see* §§ 4–301 et seq. of the Health—General Article, we consider the information contained in those treatment records to be both confidential *and* privileged. Therefore, we must examine the Board's claim that its subpoena power and obligation to oversee the conduct of the licensed social workers of this State provides an exception to petitioners' privilege and confidentiality rights as provided by law.

*B.) Supervisory and Subpoena Power of the Board over Licensed Social Workers*

Title 19 of the Health Occupations Article regulates the social work profession as it exists in this State and provides that "[t]he General Assembly finds that the profession of social work profoundly affects the lives, health, safety, and welfare of the people of this State," and that the purpose of the title "is to protect the public by: (1) Setting minimum

qualification, education, training, and experience standards for the licensing of individuals to practice social work; and (2) Promoting and maintaining high professional standards for the practice of social work." Section 19–102 of the Health Occupations Article. The Board exists as the State regulatory agency that is legislatively empowered to license and regulate social workers in Maryland. Inherent in the power to regulate the licensees is the power to investigate licensees for alleged improper conduct as it relates to their duties as social workers and to discipline any licensee that violates any of his or her statutory duties. *See McDonnell v. Commission on Medical Discipline,* 301 Md. 426, 436, 483 A.2d 76, 81 (1984) (stating that "[t]he purpose of disciplinary proceedings against licensed professionals is not to punish the offender but rather as a catharsis for the profession and a prophylactic for the public"). Of special importance to the case *sub judice* is § 19–311 of the Health Occupations Article, which provides in part:

"**§ 19–311. Denials, reprimands, suspensions, and revocations—Grounds.**

Subject to the hearing provisions of § 19–312 of this subtitle, the Board may deny a license to any applicant, fine a licensee, reprimand any licensee, place any licensee on probation, or suspend or revoke a license if the applicant or licensee:

. . .

(15) *Knowingly fails to report suspected child abuse in violation of § 5–704 of the Family Law Article.*" [Emphasis added.]

Pursuant to an investigation under any of the grounds listed in § 19–311, including an investigation into whether a social worker did, in fact, "knowingly fail[ ] to report suspected child abuse," the Legislature has specifically granted the Board, under § 19–312(c) of the Health Occupations Article, the power to issue subpoenas. The statute states:

"(c) *Subpoenas and oaths.*—Over the signature of an officer or the administrator of the Board, the Board may issue

subpoenas and administer oaths *in connection with any investigation under this title* and any hearings or proceedings before it." [Emphasis added.]

As stated, the Board initiated an investigation into the actions (or lack thereof) by Ms. F in relation to her counseling of petitioners after a complaint arose concerning acts of child abuse by John Doe that were not reported by Ms. F. It is apparent from the record, particularly the Consent Order, that substantial evidence was acquired by the Board which showed that Ms. F had acted in her professional capacity as a licensed social worker in such a way as to be subject to discipline by the Board under § 19–311 of the Health Occupations Article.[9] A subpoena was thereafter issued by the Board for the treatment records of petitioners that were made by Ms. F while she was acting in her capacity as petitioners' social worker. This subpoena was issued for the *sole purpose* of gathering any information as to whether Ms. F was in violation of Title 19 of the Health Occupations Article and subject to discipline by the Board. The social worker's treatment records relating to petitioners would be one logical, potential source of such information, if it existed.

Other statutes further express the power of the Board to subpoena records such as those sought in the case before us. In regard to the ability of a health professional licensing or disciplinary board to subpoena medical records in order to further an investigation of a licensee, § 4–306(b)(2) of the Health—General Article states that:

"(b) *Permitted disclosures.*—A health care provider *shall* disclose a medical record *without the authorization of a person in interest:*

---

9. The Board, through the use of its subpoena power, obtained the separate treatment records of other members of the Doe family, which led to its discovery of Ms. F's professional violations thus far. Because petitioners challenged the Board's subpoena power as it related to their treatment records and that challenge had not been resolved at the time the Consent Order was agreed upon, the Consent Order was entered into without any knowledge on the Board's part of what petitioners' treatment records contained in relation to additional violations by Ms. F.

. . .

(2) Subject to the additional limitations for a medical record developed primarily in connection with the provision of mental health services in § 4–307 of this subtitle, *to health professional licensing and disciplinary boards,*[10] *in accordance with a subpoena for medical records* for the *sole purpose of an investigation regarding:*

(i) Licensure, certification, or *discipline of a health professional;* or

(ii) The improper practice of a health profession." [Emphasis added.] [Footnote added.]

Moreover, § 4–307 of the Health—General Article, which deals specifically with the disclosure of mental health records,[11] states, in pertinent part:

"§ 4–307. **Disclosure of mental health records.**

. . .

(k) *Transfer of recipient; protection and advocacy system; commitment proceedings; court orders, subpoenas, etc.; death of recipient.*-(1) A health care provider *shall disclose a medical record without the authorization of a person in interest:*

. . .

(vi) In accordance with a *subpoena for medical records* on specific recipients:

1. To health professional licensing and disciplinary boards for the sole purpose of an investigation regarding licensure, certification, or *discipline of a health professional* or the improper practice of a health profession...." [Emphasis added.]

---

10. As stated, *supra,* the Board is both a licensing and disciplinary board. *See* §§ 19–301 and 19–311 of the Health Occupations Article.

11. Both parties agree that the 1998 treatment records are to be considered "mental health records" for the purposes of § 4–307 of the Health—General Article.

As petitioners correctly note, however, § 4–307(k)(6) of the Health—General Article states that:

"This subsection may not preclude a health care provider, a recipient, or person in interest from asserting in a motion to quash or a motion for a protective order any constitutional right or other legal authority in opposition to disclosure."

Petitioners, in their brief, claim that this provision "demonstrates the explicit legislative intent not to abrogate other provisions of law through § 4–307 of the Health—General Article. Hence, the exceptions to the confidentiality of medical records contained in § 4–307 of the Health—General Article have no bearing on the privilege[ ] created in ... [§ 9–121(b) of the Courts and Judicial Proceedings Article]" (alteration added). We do not agree.

Petitioners' main contention relating to their claim that the § 4–307 exceptions have no bearing on the social worker—client privilege existing under § 9–121(b) is that several enumerated exceptions exist under § 9–121(d)—(e), which petitioners claim is an exhaustive list of exceptions not to be expanded upon by any of the language found in §§ 4–306 and 4–307 of the Health—General Article. Section 9–121(d)—(e) states the exceptions to the social worker—client privilege as follows:

"(d) *Privilege inapplicable in certain circumstances.—* There is no privilege if:

(1) A disclosure is necessary for the purpose of placing the client in a facility for mental illness;

(2) A judge finds that the client, after being informed there will be no privilege, makes communications in the course of an examination ordered by the court;

(3) In a civil or criminal proceeding:

(i) The client introduces the client's mental condition as an element of the claim or defense; or

(ii) After the client's death, the client's mental condition is introduced by any party claiming or defending through or as a beneficiary of the client;

(4) The client or the personal representative of the client makes a claim against the licensed certified social worker for malpractice; or

(5) The client expressly consents to waive the privilege, or in the case of death or disability, the client's personal representative waives the privilege for purpose of making a claim or bringing suit on a policy of insurance on life, health, or physical condition.

(e) *Privilege inapplicable in certain proceedings.*—There is no privilege in:

(1) Any administrative or judicial nondelinquent juvenile proceeding;

(2) Any guardianship and adoption proceeding initiated by a child placement agency;

(3) Any guardianship and protective services proceeding concerning disabled persons; or

(4) Any criminal or delinquency proceeding in which there is a charge of child abuse or neglect or which arises out of an investigation of suspected child abuse or neglect."

■ As stated, petitioners assert that this statutory listing of the inapplicability of the social worker—client privilege in certain circumstances and proceedings is exhaustive and that "the General Assembly was free to add an additional, tenth exception to the legislative scheme, but it chose not to." Petitioners fail, however, to acknowledge the ultimate authority found in the language of § 9–121(b), which allows for the existence of the privilege in the first place. The language establishing the privilege is preceded by *"Unless otherwise provided ..."* (emphasis added). What it does not say is "unless otherwise provided in this subtitle" or the like. Therefore, the exceptions to the social worker—client privilege found in § 9–121(d)—(e) of the Court and Judicial Proceedings Article are not meant to be exhaustive insofar as they would exclude an exemption to the privilege based on an investigation by the Board of one of its social workers not fulfilling her statutorily mandated duties under § 5–704(a) of the Family Law Article. The statute establishing a social

worker—client privilege and its exceptions does not exist in a vacuum but can be, *and is,* affected by other statutes which further limit the scope of the privilege. Our conclusion is bolstered by the fact that several other exceptions to the social worker—client privilege that are not enumerated in § 9–121(d)—(e) are recognized by law, *e.g.,* the requirement that social workers report suspected child abuse (§ 5–704(a) of the Family Law Article); the requirement that social workers report the "abuse, neglect, self-neglect, or exploitation" of an "alleged vulnerable adult" (§ 14–302(a) of the Family Law Article); the duty of mental health care providers to warn their patients' intended victims (§ 5–609 of the Courts and Judicial Proceedings Article); and permission to disclose exculpatory information. *See Goldsmith v. State,* 337 Md. 112, 133–34, 651 A.2d 866, 877 (1995) (where showing is made that there is a "reasonable likelihood" that privileged records contain exculpatory information necessary for a proper defense, the privilege may be abrogated). It is readily apparent, therefore, that there exist exceptions to the social worker—client privilege that are *not* specifically enumerated in § 9–121(d)—(e) of the Courts and Judicial Proceedings Article, but that *nevertheless limit successful assertion of the privilege.*

 As this Court has stated, "the paramount rule of statutory construction is to ascertain and effectuate the intent of the legislature." *Gillespie v. State,* 370 Md. 219, 221, 804 A.2d 426, 427 (2002). Furthermore, "when the Legislature acts, it 'is presumed to be aware of its own enactments.' " *Maryland State Highway Admin. v. Kim,* 353 Md. 313, 324, 726 A.2d 238, 244 (1999) (quoting *State v. Hernandez,* 344 Md. 721, 727, 690 A.2d 526, 529 (1997)). With this in mind, we do not accept petitioners' argument that the social worker—client privilege established under § 9–121(b) *automatically* prohibits the Board from subpoenaing petitioners' 1998 treatment records for the purpose of investigating one of its licensed social workers for professional violations, especially those involving allegations that a licensed social worker has knowingly failed to report child abuse. As the intermediate appellate court rightfully stated in its opinion below, "it would create an

absurd result to mandate that a social worker report child abuse, while at the same time, permit the abuser and/or the social worker to prevent the Board from investigating a complaint of failure to report the suspected abuse." *Doe*, 154 Md.App. at 541, 840 A.2d at 757. We agree with the intermediate appellate court's assessment.

It is obvious that the Board is statutorily permitted to investigate allegations that a licensed social worker has knowingly failed to report suspected child abuse. *See* § 19–311(15) of the Health Occupations Article. If a social worker, in this case Ms. F, knowingly fails to report incidents of child abuse, this is something in which the Board would understandably take an interest and seek to remedy accordingly, presumably through its disciplinary powers subsequent to an investigation into the matter. The social worker—client privilege cannot be allowed to create an impenetrable wall to investigations of such importance. Section 5–704 of the Family Law Article requires social workers to notify the appropriate department or law enforcement agency, *notwithstanding any law on privileged communications*, if there is a reason to believe that a child has been subjected to abuse. If the Legislature has provided that the privilege does not prevent a social worker from reporting the abuse,[12] it follows that the privilege *must not prevent* the investigation of a social worker who is suspected of knowingly not reporting such abuse.

Other courts have held that a statutorily-enacted privilege does not automatically work to prevent investigatory boards from obtaining confidential records under similar circumstances as those existing in the case *sub judice*. In *State Medical Board of Ohio v. Miller*, 44 Ohio St.3d 136, 541 N.E.2d 602 (1989), a physician who was the subject of an investigation by the state medical board for "improperly pre-

---

**12.** *See Reynolds v. State*, 88 Md.App. 197, 594 A.2d 609, *cert. granted*, 325 Md. 115, 599 A.2d 819 (1991), *aff'd*, 327 Md. 494, 610 A.2d 782 (1992), *cert. denied*, 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993) (Court of Special Appeals stating that there was no privilege against a counselor's legally required disclosure of fact of child abuse to law enforcement officials under § 5–704 of the Family Law Article.)

scribing controlled substances" moved to quash an investigative subpoena *duces tecum* that sought the physician's "patient records for a number of his patients." *Id.* at 136, 541 N.E.2d at 602–03. The physician asserted that the physician—patient privilege, as set forth by a state statute, precluded the disclosure of the requested records. On appeal, the Supreme Court of Ohio framed the issue before it as follows:

"This case presents the question of how a statute, designed to permit investigation of the suspected wrongdoing of physicians, is impacted by the physician—patient privilege."

*Id.* at 138, 541 N.E.2d at 603–04. In holding that the physician—patient privilege did not prevent the state medical board from compelling production of confidential patient records, the state supreme court stated that "[w]hile we are cognizant of the laudable purpose and goal to be achieved by the physician—patient privilege, we are likewise cognizant that *the privilege may not be invoked automatically in all circumstances*." *Id.* at 140, 541 N.E.2d at 605 (emphasis added). The court first noted that, because "there existed no physician—patient privilege at common law ... the privilege is in derogation of the common law [and] must be strictly construed against the party seeking to assert it." *Id.* Next, the court observed that "the opportunity to practice medicine is not an unqualified right. All physicians must be licensed to practice pursuant to [the state licensing statute]." *Id.* (alteration added). Thirdly, the court stated that "in certain circumstances, the policy considerations underlying the physician—patient privilege are outweighed by other factors.... We feel that the interest of the public at large, *served here through the board's investigation of possible wrongdoing by a licensed physician*, outweighs the interests to be served by invocation of the physician—patient privilege." *Miller*, 44 Ohio St.3d at 140–41, 541 N.E.2d at 606 (emphasis added). Lastly, the court gave weight to the fact that the state medical board was required by statute to maintain the confidentiality of patient records reviewed during an investigation. The statute itself stated that "[t]he board shall conduct all investigations and proceedings in such a manner as to protect patient confiden-

tiality. The board shall not make public names or other identifying information about patients unless proper consent is given." *Id.* at 141, 541 N.E.2d at 606.

Similarly, in the case of *In re Board of Medical Review Investigation,* 463 A.2d 1373 (R.I.1983), a physician petitioned to quash a subpoena *duces tecum* ordering production of certain patient-treatment records, which were sought by the state's Board of Medical Review Investigation to determine whether the physician was guilty of unprofessional conduct.[13] The state supreme court framed the issue before it as follows:

> "The issue before us is whether or not the [statutory physician—patient privilege] [14] should be construed to prevent the subpoenaing of a physician's records of patient treatment during an investigation by the Board of Medical Review of alleged unprofessional conduct."

*Id.* at 1373–74 (alteration added) (footnote added).

The Supreme Court of Rhode Island first noted that "[t]he Legislature created the Board of Medical Review and empowered it 'to investigate all complaints and charges of unprofessional conduct against any licensed physician and to hold hearings to determine whether such charges are substantiated.' In furtherance of this statutory directive the board has the authority to issue subpoenas 'to compel the production of documents or other written records....'" *Id.* at 1374 (citations omitted). The state supreme court then found that "the purpose of the [physician—patient privilege] is not violated by

---

13. The specific conduct for which the physician was being investigated included "accusations that [the physician] had prescribed controlled substances without conducting a required physical examination, that he had issued false prescriptions, and that he had failed to file reports with the Division of Drug Control." *In re Board,* 463 A.2d at 1373.

14. As with the case now before us, the Rhode Island legislature had provided specific exemptions to the statutory privilege at issue in *In re Board,* but the court found that "[n]one of these exemptions applies to the present case." Nevertheless, the state supreme court found that "the overall legislative policy would best be implemented by disclosure [of the privileged records] to the board." *In re Board,* 463 A.2d at 1376 (alteration added).

the board's subpoenaing a physician's records of his patients during a board investigation of alleged unprofessional conduct ... because the ... investigations are confidential.... [T]he patient-physician privilege shall not prevent the board from carrying out its investigation...." *Id.* at 1376 (alteration added). The court concluded its reasoning for holding that the asserted privilege did not prevent an investigation by the medical review board by stating:

"By establishing the Board of Medical Review and authorizing it to investigate charges of unprofessional conduct against physicians, the Legislature manifested a desire to improve the quality of health-care services rendered in this state and to maintain a standard of professional ethics. By enacting the [statutory physician—patient privilege], the Legislature has sought to encourage open disclosure of information from patient to physician so as to aid in the effective treatment of the patient. *However, when a physician is under investigation for unprofessional conduct and the physician attempts to invoke the patient-physician privilege and to prevent the investigatory committee from obtaining records necessary to its investigation, it seems apparent that the injury to society's interest in probity within the medical profession is much greater than the injury done to the patient's interest in the privacy of his medical records.*"

*In re Board,* 463 A.2d at 1376 (alteration added) (emphasis added).

We find the reasons behind these courts' actions of holding that a statutory privilege cannot automatically prevent an investigatory board's effort to subpoena relevant medical records to be persuasive. Although the cases discussed dealt with the physician—patient privilege as it existed in those states, the thrust of both holdings as to why a statutory privilege should not always prove insurmountable to a legitimate and specific board investigation is undoubtedly relevant to the sphere of social worker—client privileges. A state investigatory board that is statutorily charged with regulating and disciplining its licensees should not be barred, generally, from

conducting a thorough investigation into allegations of the unprofessional conduct of a licensee, especially when the Legislature has specifically provided that the state investigatory board has the power to subpoena records pursuant to an investigation.

As with both the Supreme Court of Ohio and the Supreme Court of Rhode Island, we are persuaded that our holding is further warranted due to the fact that Maryland law, like the laws of those two states, provides adequate safeguards to prevent the disclosure of petitioners' treatment records. As stated, *supra*, § 4–302(a) of the Health—General Article requires health care providers to keep medical records confidential and allows disclosure only as provided by Maryland law. When confidential records are disclosed under Maryland law, however, § 4–302(d) of the Health—General Article expressly prohibits the *redisclosure* of those disclosed records:

"(d) *Redisclosure.*—A person to whom a medical record is disclosed may not redisclose the medical record to any other person unless the redisclosure is:

(1) Authorized by the person in interest;

(2) Otherwise permitted by this subtitle. . . ."

There is no other provision in this subtitle permitting the redisclosure of treatment records by the Board. In fact, § 4–309 of the Health—General Article provides that "a health care provider *or any other person*" (emphasis, added) who discloses a medical record in violation of the subtitle shall be subjected to a possible criminal fine and to civil damages. The Board is statutorily required by this subtitle to keep confidential those records which it seeks to examine pursuant to its investigation of Ms. F. We find that the Legislature has provided adequate safeguards against the disclosure by the Board of any information that it seeks to obtain through its statutorily-enacted subpoena power. Petitioners' social worker—client privilege in regard to their 1998 treatment records does not prevent the Board from subpoenaing those records pursuant to its investigation of Ms. F.

*C.) Constitutional Privacy Interest in Preventing Disclosure*

■ Petitioners next argue that the Court of Special Appeals erred in accepting the finding by the circuit court that the Board's interest in obtaining petitioners' therapy records outweighed petitioners' constitutional privacy interest in preventing disclosure. For the reasons that follow, we do not agree.

■ This Court has stated that "the right to privacy is protected by the federal constitution and ... where the right is applicable, regulation limiting it must be justified by a 'compelling state interest.'" *Montgomery County v. Walsh,* 274 Md. 502, 512, 336 A.2d 97, 104–05 (1975), *appeal dismissed,* 424 U.S. 901, 96 S.Ct. 1091, 47 L.Ed.2d 306 (1976); *see also Doe v. Commander, Wheaton Police Dep't.,* 273 Md. 262, 272, 329 A.2d 35, 41 (1974) (stating that "regulation limiting [the right of privacy] must be justified by a 'compelling state interest'") (alteration added). The United States Supreme Court has recognized that "cases ... characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. *One is the individual interest in avoiding disclosure of personal matters,* and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977) (emphasis added) (footnotes omitted). Medical records fall within the protections of this right to privacy. *See In re Search Warrant (Sealed),* 810 F.2d 67, 71 (3d Cir.1987), *cert. denied,* 483 U.S. 1007, 107 S.Ct. 3233, 97 L.Ed.2d 739 (1987) (stating that "medical records are clearly within this constitutionally protected sphere"); *see also United States v. Westinghouse Electric Corp.,* 638 F.2d 570, 577 (3d Cir.1980) (stating that "[t]here can be no question that ... medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection"). In the case *sub judice,* petitioners assert their privacy interest in nondisclosure of their 1998 treatment records. Therefore, the Board, a State agency, must show a "compelling state interest" before it will be allowed to infringe

on petitioners' privacy rights regarding their treatment records.

In the case of *Dr. K v. State Board of Physician Quality Assurance*, 98 Md.App. 103, 632 A.2d 453 (1993), *cert. denied*, 334 Md. 18, 637 A.2d 1191, *cert. denied*, 513 U.S. 817, 115 S.Ct. 75, 130 L.Ed.2d 29 (1994), after receiving formal written complaints that a psychiatrist and his former patient were having a romantic relationship and that the psychiatrist was depressed and abusing alcohol, the State Board of Physician Quality Assurance [15] initiated an investigation and subpoenaed the psychiatrist's records relating to the patient's treatment. Akin to petitioners in the case *sub judice*, in *Dr. K* the patient claimed on appeal to the intermediate appellate court that her constitutional right to privacy barred the disclosure of her mental health records to the Board of Physician Quality Assurance.[16] *See id.* at 107, 632 A.2d at 455.

The Court of Special Appeals, after finding that the patient had a right to privacy in her medical records, proceeded to analyze whether or not this individual privacy interest trumped the State's competing interest in obtaining the medical records under the standard described in *United States v. Westinghouse Electric Corp.*, 638 F.2d 570 (3d Cir.1980). In explaining the analytical framework of *Westinghouse*, which the intermediate appellate court adopted in its analysis, the court stated:

"In those cases where a court has allowed intrusion into the privacy right in medical records, 'it has usually done so only

15. The Board of Physician Quality Assurance is now known as the Board of Physicians. *See* § 14–201 of the Health Occupations Article.

16. In the same way that the Board of Social Work Examiners may take disciplinary actions subsequent to an investigation into the conduct of a licensed social worker, the Board of Physicians may "reprimand any licensee, place any licensee on probation, or suspend or revoke a license" if the licensee is found to have acted in any such manner as enumerated in § 14–404(a) of the Health Occupations Article. The Board of Physicians, like the Board of Social Work Examiners, has been statutorily granted the right to subpoena in connection with an investigation of a licensee. *See* § 14–206(a) of the Health Occupations Article.

after finding that the societal interest in disclosure outweighs the privacy interest on the specific facts of the case.'
... [T]he [*Westinghouse*] court specified several factors to consider in the 'delicate task' of weighing the government's competing interest. Those factors are: the type of record requested, the information it contains, the potential for harm in subsequent nonconsensual disclosure, the injury in disclosure to the relationship for which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the government's need for access, and whether there is an express statutory mandate, articulate public policy, or other public interest militating towards access."

*Dr. K*, 98 Md.App. at 114–15, 632 A.2d at 459 (alteration added) (citing *Westinghouse*, 638 F.2d 570, 578 (3d Cir.1980)).

After weighing all of the pertinent factors mentioned in *Westinghouse*, the Court of Special Appeals held that:

"the State's interest outweighs patient A's privacy right in this instance. *To give a patient, in effect, a veto over the Board's power to regulate licensed physicians would be to eviscerate the Board's ability to protect the larger public interest.* This is especially true in a case such as this—where the patient may not object to, or may even support, the physician's allegedly unprofessional or unethical behavior. A decision in favor of patient A would allow those physicians who are unscrupulous and in a position to exert influence over their patients to stop a *preliminary investigation* by the Board in its tracks."

*Dr. K*, 98 Md.App. at 120, 632 A.2d at 461–62 (some emphasis added).

Although the *Dr. K* case dealt with the wrongdoings of a physician and not those of a social worker, the substance of the intermediate appellate court's reasons for its decision as to why privacy interests may at times be overcome by the interests of a state licensing and disciplinary board are compelling. The importance of an investigation by a state agency into the alleged improper conduct of its professional licensees

was further stated by the United States District Court for the District of Maryland in *Patients of Dr. Barbara Solomon v. Board of Physician Quality Assurance*, 85 F.Supp.2d 545 (D.Md.1999):

> "It is beyond doubt that society has a deep interest in ensuring, through its government agencies, that practicing physicians meet moral and professional standards. Investigations are necessary and may involve the subpoenas of medical records. As the [Court of Special Appeals of Maryland] noted in *Dr. K*, allowing individual patients to block Board investigations—as the Patients seek to do here—would hinder the Board's ability to protect public health."

*Id.* at 548 (alteration added).

We agree with the intermediate appellate court that the balancing test framework described in *Westinghouse*, and applied in *Dr. K*, is the correct standard to use when balancing individual privacy interests in medical records against competing state interests in those records. *See Dr. Solomon*, 85 F.Supp.2d at 548 (stating that, "[a]lthough *Dr. K* is not binding on this Court, it is clearly in line with relevant federal case law") (citing *Schachter v. Whalen*, 581 F.2d 35 (2d Cir.1978) (patients' constitutional rights not infringed where state board for professional medical conduct subpoenaed medical records in the course of a disciplinary investigation) and *In re Search Warrant (Sealed)*, 810 F.2d 67 (3d Cir.1987) (state's interest in investigating physician for health care fraud outweighed patients' privacy in medical records)). Whether a compelling state interest can be shown in order to override an individual's privacy interest is to be determined on a case-by-case basis. Therefore, we shall proceed to examine whether the intermediate appellate court was correct in finding that the Board's interest in obtaining petitioners' treatment records did in fact outweigh petitioners' right to keep those records private, *i.e.*, nondisclosed.

In regard to the first *Westinghouse* factor, concerning the type of record requested and the information it contains,

Chief Judge Murphy of the Court of Special Appeals, writing for that court, stated that because "[t]he subpoena in this case directed a social worker to deliver 'the complete patient file' for Jane and John Doe 'for the calendar year 1998,' " petitioners' treatment records "contain information of a highly private nature." *Doe*, 154 Md.App. at 537, 840 A.2d at 754. We agree with the intermediate appellate court in regard to this first factor. As stated, *supra*, petitioners' treatment records at issue are to be considered "medical records" for the purposes of the Confidentiality of Medical Records Act, §§ 4–301 et seq. of the Health—General Article, and private by their very nature.

Turning next to the potential for harm in subsequent nonconsensual disclosure, the Court of Special Appeals stated that:

> "Even though Mr. Doe has been convicted of criminal charges, the records at issue are potentially harmful to the Does. Because of the nature of the charges being investigated, and the potential for embarrassment if the records were subsequently disclosed, without the consent of the interested parties, the 'potential for harm' is present."

*Doe*, 154 Md.App. at 537, 840 A.2d at 754–55. Obviously, because the treatment records may apparently provide evidence that generational child abuse was occurring in petitioners' household, we find no fault with the intermediate appellate court's assessment of the "potential for harm" to petitioners if the treatment records are disclosed to the Board. This is merely one factor to consider in the balancing framework, however, and must be balanced against the Board's interests in obtaining the records.

In regard to the adequacy of safeguards to prevent unauthorized disclosure we find, for the identical reasons stated, *supra*, that §§ 4–302(d) and 4–309 of the Health—General Article provide adequate safeguards under the law to prevent further disclosure of petitioners' treatment records. The intermediate appellate court also found that adequate safeguards to prevent unauthorized disclosure existed for sub-

stantially the same reasons. *See Doe,* 154 Md.App. at 538, 840 A.2d at 755 (stating that "[a]lthough these safeguards may not be fail-proof, security precautions that are substantial but 'not foolproof' are constitutionally adequate") (quoting *Schachter v. Whalen,* 581 F.2d 35, 37 n. 2 (2nd Cir.1978)); *see also Dr. Solomon,* 85 F.Supp.2d at 547 (United States District Court for the District of Maryland stating that "Maryland statutes provide an adequate safeguard against unauthorized disclosure [of medical records] . . .") (alteration added).

 Moving next to whether there exists "an express statutory mandate, articulate public policy, or other public interest militating towards access," *Dr. K,* 98 Md.App. at 115, 632 A.2d at 459, we agree with the intermediate appellate court that the Board's interests in obtaining Ms. F's treatment records of petitioners are clearly compelling. Of great importance is the fact that the Board itself was established by the Legislature "to protect the public by: (1) Setting minimum qualification, education, training, and experience standards for the licensing of individuals to practice social work; and (2) Promoting and maintaining high professional standards for the practice of social work." Section 19–102 of the Health Occupations Article. As the Court of Special Appeals stated in this regard:

> "*To deny the Board access to patient files is to deny it the ability to carry out its legislative mandate.* If the Social Worker Board receives a complaint that a social worker failed to notify the appropriate agency of his/her reason to believe that a child had been subjected to abuse, a lack of access to the worker's records would 'effectively foreclose any meaningful investigation into that conduct and any basis for disciplinary action.' "

*Doe,* 154 Md.App. at 539, 840 A.2d at 755 (emphasis added) (quoting *Dr. K,* 98 Md.App. at 118, 632 A.2d at 461). It does not follow that a State entity charged with the licensing and oversight of the State's licensed social workers could be prevented from making any investigations into the conduct of one of its licensees through the use of the social worker's

client treatment records at the first instance a "person in interest" (here, petitioners) alleges that his or her privacy interests in those records inhibit that investigation. There is clearly an important public interest supporting the creation of an entity to oversee the licensing, regulation, and discipline of this State's licensed social workers. There likewise exists a compelling state interest in seeing that Board investigations of social workers who allegedly have improperly conducted themselves in any of the ways listed in § 19–311 of the Health Occupations Article are fully carried out and the social worker dealt with accordingly.[17]

Petitioners also claim that, because Ms. F has already been subjected to Board discipline and that a "Consent Order" between the Board and Ms. F precludes any further action by the Board against Ms. F pertaining to her actions of not reporting suspected child abuse, there cannot be said to be a viable need for the Board to examine petitioners' treatment records. We disagree.

The Consent Order, filed on October 10, 2003 and signed by both Ms. F as "respondent" and Mary C. Burke, Chairperson of the Board, consists of a "Procedural Background, Findings of Fact, Conclusions of Law and Order." The agreed-to findings were that Ms. F "engaged in a course of conduct that is inconsistent with generally accepted standards in the practice of social work," that she "knowingly failed to report suspected child abuse" and that she "failed to maintain adequate patient records." For these transgressions, Ms. F was suspended from the practice of social work for one year, ordered to complete varying courses dealing with sexual abuse and documentation and also was subjected to a probationary period of two years. Petitioners point to a specific paragraph in the Order to bolster their assertion that the Board's need

---

**17.** As stated, *supra*, it is alleged that Ms. F knowingly failed to report suspected child abuse in violation of § 5–704 of the Family Law Article, which itself may lead to disciplinary measures being taken by the Board against the social worker under § 19–311(15) of the Health Occupations Article.

for their treatment records has been diminished as a result of this Consent Order. The specific passage states:

"**AGREED** that [Ms. F's] conduct as stated in the Charges of June 12, 2002, the Amended Charges of August 8, 2003, and the Findings of Fact, Conclusions of Law and Order as stated in this Consent Order, will not be used in the future as the basis for any further action involving [Ms. F's] license, including renewal or non-renewal of [Ms. F's] license...." [Alterations added.]

What petitioners' do not point out, however, is the importance of the paragraph immediately following that part of the Order and its effect on the ability of the Board to discipline Ms. F *further* if, after an examination of Ms. F's client treatment records as to the petitioners, additional discipline is warranted. It states:

"**ACKNOWLEDGED** by the parties that an appeal filed by [petitioners] is pending regarding the Board's access to the treatment records of [petitioners], and if the Board is able to obtain those records, *the Board will not be precluded from taking further action involving* [Ms. F's] *license if* [petitioners'] *records provide probable cause to support violations in addition to those investigated and pursued in these proceedings* ...." [Alterations added.] [Emphasis added.]

Because the Board has not yet been provided with petitioners' treatment records, there may yet be other serious issues relating to Ms. F's conduct as a social worker. We therefore agree with the Court of Special Appeals' assessment, which stated that "the case ... is not moot merely because Ms. F faces no additional discipline for her failure to report her former client's abuse." *Doe,* 154 Md.App. at 541, 840 A.2d at 757. As the Consent Order states, there may exist other "violations in addition to those investigated and pursued" by the Board. The Board's desire for these records is not merely a "fishing expedition," as petitioners deem it to be, but an understandable need by the Board to have all the relevant facts regarding Ms. F's conduct as a licensed social worker

before it so that it can best decide if additional discipline is proper and to *fulfill its legislative mandate* that it *"protect the public* by ... [p]romoting and maintaining high professional standards for the practice of social work." Section 19–103 of the Health Occupations Article (emphasis added). We agree with Chief Judge Murphy's analysis for the intermediate appellate court and find that the Board has shown, under those factors as described in *Westinghouse,* that there exists a compelling state interest in obtaining petitioners' treatment records via its statutorily enacted subpoena power. This compelling state interest overcomes petitioners' privacy rights in the records.

## Conclusion

We hold that neither the social worker—client privilege codified in § 9–121(b) of the Courts and Judicial Proceedings Article nor any claim concerning petitioners' constitutional right to privacy automatically prevents the Board from subpoenaing petitioners' treatment records pursuant to an investigation into allegations that one of its licensees was in violation of her statutorily mandated duties. Clearly, the Board has the right and the duty to investigate social workers suspected of statutory violations. While the Board is required by law to protect the petitioners' treatment records from further disclosure, the Board must be allowed to have access to those treatment records in order to fulfill its statutory mandate to protect the public by conducting a full investigation and, where appropriate, disciplining those licensed social workers who are found to be in violation of the provisions of Title 19 of the Health Occupations Article. This mandate cannot be carried out if clients are automatically allowed, after claiming either a social worker—client privilege or a constitutional privacy right, to block from disclosure records that the Board determines are necessary to its investigations. If such a privilege or privacy right were to take precedence over the Board's interest in investigating allegations that one of its licensees was acting in violation of his or her professional obligations, the lack of access to client treatment records could

impede a meaningful investigation into that conduct and discovery of a further basis for disciplinary action.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.**

RAKER and BATTAGLIA, JJ., Dissent.

Dissenting opinion by BATTAGLIA, J. which RAKER, J., joins.

I respectfully dissent. The enforceability of the subpoena at issue in this case is directed not only to the treatment records of Jane and John Doe, but to *all* the other clients of Ms. F., the licensed social worker in this case. I believe that those other clients have a privacy interest at stake [1] and that under the circumstances presented here, the State has not presented a sufficient compelling state interest to overcome the confidentiality and statutory privilege attached to those records. A social worker's client has a strong interest in preventing disclosure of treatment records because of the personal, private intimate nature of the information ordinarily contained therein. In addition, the client has an interest in keeping private the fact that he or she was even in treatment. Although this privacy interest is not absolute, the burden is on the State to show that the individual privacy interest is outweighed by a legitimate interest of the State in securing this information. In this case, the State has failed to satisfy its burden.

The majority's inference regarding the breadth of the Board's authority is not grounded in any indicia of systemic wrongdoing by Ms. F. Further, although the majority espouses the *Westinghouse* factors, which provide the framework for balancing the government's interest in disclosure

---

1. A social worker has standing to raise the privacy interests of her clients. *Cf. Singleton v. Wulff,* 428 U.S. 106, 117, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (allowing a physician to assert privacy rights of his or her patients); *Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (holding that a physician has standing to raise his or her patient's privacy rights).

against the clients' privacy interest in the information, no application of the factors is made with respect to the disclosure of *all* treatment records of *all* of Ms. F's clients. Moreover, the Maryland statute does not provide adequate safeguards to prevent unauthorized disclosure of the treatment records.

In the present case, the Board initiated an investigation into Ms. F's failure to report after a complaint was filed concerning child abuse by John Doe that was not reported by Ms. F while she was acting in her professional capacity as a licensed social worker. The Board has not shown any connection between the investigation and the requested disclosure of *all* of Ms. F's clients' files for unrelated individuals. To permit the Board to delve into apparently unrelated files without any indication that the wrongdoing was not confined to this particular instance would in fact result in a "fishing expedition." Before the Board should be permitted to intrude on the sensitive and highly personal information of *all* people who sought treatment by social workers, something more must be required than mere interest by the Board in the files. Otherwise, we invite a potential witch hunt into the emotional lives of people who have not been notified nor been given the opportunity to be heard about the disclosure of their mental health records in the name of protecting the public, whenever an allegation of wrongdoing is made with respect to the treatment provider.

I agree with the majority that *United States v. Westinghouse Electric Corp.*, 638 F.2d 570 (3d Cir.1980) sets out the proper analytical framework for balancing the competing interest of the individual and the State. *See* maj. op. at 185, 862 A.2d at 1009. Those factors are as follows:

> the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express

statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Westinghouse,* 638 F.2d at 578.

The first *Westinghouse* factor requires this Court to consider the type of record requested. The majority, however, did not apply those standards when it decided to permit a whole-sale review of all of Ms. F's treatment records, without notice and an opportunity to be heard. All of Ms. F's treatment files for her clients are properly classified as "mental health records" under Md.Code (1982, 2000 Repl.Vol., 2004 Supp.), §§ 4-301, *et seq.* of the Health—General Article, due to the highly sensitive personal information contained in them. As such, all of Ms. F's treatment files are confidential.

Moreover, the second and third *Westinghouse* factors, concerning the information contained in the files and the potential for harm in subsequent nonconsensual disclosure, mandate the conclusion that disclosure of Ms. F's files for *all* of her clients must not be permitted. Such files contain all types of information that could potentially be harmful to the client should it be revealed subsequently, including thoughts of suicide, information about a client's emotional needs and desires, and other personal struggles generally not disclosed to the public. Certainly it does not require much imagination to devise any number of disastrous outcomes for a client should any of that potentially damaging personal information be revealed, including even the person's identity.[2]

Because the majority has not required the Board to articulate why current treatment records for *all* clients are disclosa-

---

2. There may be federal law implications with respect to wholesale disclosure of all of the treatment files under the privacy provisions of the Health Insurance Portability and Accountability Act (HIPAA), Pub. Law 104–191, 110 Stat.1936 (1996) (codified at 18 U.S.C. §§ 24, 669, 1035, 1347, 1518, 3486 (2000); 26 U.S.C. §§ 220, 4980C to 4980E, 6039F, 6050Q, 7702B, 9801–9806 (2000); 29 U.S.C. §§ 1181 to 1187 (2000); 42 U.S.C. §§ 300gg, 300gg–11 to 300gg–13, 300gg–21 to 300gg–23, 300gg–41 to 300gg–47, 300gg–91, 300gg–92, 1320a–7c to 1320a–7e, 1320d–1 to 1320d–8, 1395b–5, 1395ddd (2000)), that have not been explored.

ble, it does not in any way address the potential injury to the relationship between Ms. F and all of the clients caused by disclosure. Without something more than mere unsupported suspicion, disclosure would result in chilling the free discourse required between any treatment provider and her clients and deter clients from seeking help from any other treatment provider. It could irreparably harm the relationship and deprive all such clients of much needed counseling and services.

The majority concludes that the Legislature has provided adequate safeguards against disclosure by the Board of any information that it seeks to obtain through the subpoena power. *See* maj. op. at 182, 862 A.2d at 1008. I disagree. The majority does not consider the impact of Section 5–704 of the Family Law Article, which sets forth the circumstances in which social workers are considered mandatory reporters of child abuse. Section 5–704 provides in pertinent part:

(a) *In general.*—Notwithstanding any other provision of law, including any law on privileged communications, each health care practitioner, police officer, educator, or human service worker, acting in a professional capacity in this State:

(1)(i) who has reason to believe that a child has been subjected to abuse, shall notify the local department or the appropriate law enforcement agency

Md.Code (1984, 1999 Repl.Vol., 2004 Supp.), § 5–704(a) of the Family Law Article. Nine of the members of the Board of Social Work Examiners are social workers, Md.Code (1981, 2000 Repl.Vol., 2004 Supp.), § 19–202(a)(2) of the Health Occupations Article, who conceivably continue to be bound by their statutory obligation to report what they believe may be abuse to the proper authorities. It is not too difficult to conceive of situations in which a social worker's notes could refer to "striking" or "spanking" for instance, where the Board could identify an obligation to report child abuse or if not so reported, and injury subsequently occurred, there may be potential civil liability under *Horridge v. St. Mary's County*

*Department of Social Services,* 382 Md. 170, 854 A.2d 1232 (2004).

What would happen if the Board discovers information indicating that a client intended to commit suicide or intended to commit a non-violent crime, such as shoplifting or illicit drug use? What if the Board discovered notes about a client's comments, made during a domestic dispute, that she would like to kill her husband? There is an inherent conflict for the Board members who are social workers between their obligations as professionals and their statutory duty to prevent redisclosure. There are no guidelines for the Board's actions where there is wholesale disclosure of treatment files.

The final *Westinghouse* factors are the government's need for access and whether there is an express statutory mandate, public policy, or other public interest militating access. Although the majority correctly states that the Board was established by the General Assembly "to protect the public by: (1) Setting minimum qualification, education, training, and experience standards for the licensing of individuals to practice social work, and (2) Promoting and maintaining high professional standards for the practice of social work," Md. Code (1981, 2000 Repl.Vol.), § 19–102 of the Health Occupations Article, neither of these purposes justify an unwarranted intrusion into the treatment records of other clients, who neither know about the disclosure nor have they been given an opportunity to be heard. Without any evidence specific to the other clients supporting the belief that further wrongdoing by the social worker occurred, this indeed becomes a "fishing expedition."

The majority cites *Dr. K v. State Board of Physician Quality Assurance,* 98 Md.App. 103, 632 A.2d 453 (1993), and the opinion by the United States District Court for the District of Maryland in *Patients of Dr. Barbara Solomon v. Board of Physician Quality Assurance,* 85 F.Supp.2d 545 (D.Md.1999), with approval. Although those opinions support the determination that the Board properly subpoenaed the

Does' records, they fall far short of justifying a subpoena, in this case, for Ms. F's records for *all* of her clients.

Both *Dr. K* and *Patients of Dr. Solomon* involved subpoenas for records of specific patients. *Dr. K,* 98 Md.App. at 105–06, 632 A.2d at 454–55; *Patients of Dr. Barbara Solomon,* 85 F.Supp.2d at 546. In *Patients of Dr. Barbara Solomon,* as in the present case, the patients asserted that disclosure of their medical records violated their privacy interest. *Patients of Dr. Barbara Solomon,* 85 F.Supp.2d at 546. Because the District Court opinion did not summarize the facts of the underlying case, the following facts are found in the Court of Special Appeals case addressing the merits of the case. The nineteen patients who sought the temporary restraining order and preliminary injunction from the United States District Court were randomly selected from Dr. Solomon's appointment logs by the Board in its investigation of her consent and disclosure procedures, billing practices, and use of experimental procedures. *Solomon v. Board of Physician Quality Assurance,* 155 Md.App. 687, 700–01, 845 A.2d 47, 55 (2003). Because the scope of the complaint implicated practices that occurred with all of Dr. Solomon's patients, the Court of Special Appeals found the information sought by the subpoena to be relevant to the investigation and the demand sufficiently limited. *Id.* In the case of *Dr. K.,* the subpoena at issue directed Dr. K to deliver "any and all medical records" of patient A; Dr. K. was patient A's psychiatrist. *Dr. K,* 98 Md.App. at 115, 632 A.2d at 459.

In the instant case, the allegations in the complaint against Ms. F do not reflect systemic practices, but rather her conduct with a specific client in a particular situation. We are not talking about billing records here we are talking about notes reflecting the innermost concerns of individuals. Significantly absent from the majority discussion is any means of notification to Ms. F's other clients prior to the disclosure of their files. Unlike the case involving Dr. Solomon, where the patients were clearly notified that their medical records were subpoenaed by the Board of Physician Quality Assurance, the majority grants the Board unfettered access to any treatment

provider's files, without allowing the clients any opportunity to be heard.

In *Dr. K*, the State Board of Physician Quality Assurance initiated an investigation of Dr. K following a complaint alleging that he and his former patient were involved in a romantic relationship and that he was depressed and abusing alcohol. *Dr. K*, 98 Md.App. at 105–06, 632 A.2d at 455. Dr. K asserted the patient's privacy interest to bar the disclosure of her mental health records. *Id.* at 106–07, 632 A.2d at 454–55. The case did not involve an attempt by the Board of Physician Quality Assurance to obtain access to all of Dr. K's patient files. As in *Dr. K*, the complaint against Ms. F only implicated her actions with respect to the Does and did not extend beyond her treatment of that family. The reasoning of *Dr. K* cannot be twisted to support access to any files beyond those prepared for the Does.

Therefore, the caselaw cited does not support disclosure of *all* treatment files for *all* of Ms. F's clients. Any analysis of the *Westinghouse* factors would show that the privacy interests of Ms. F's other clients *would* substantially outweigh the interest that the Board would have in obtaining access to Ms. F's files for *all* of her clients, had that analysis occurred. The majority's sweeping opinion is a dangerous intrusion into the private lives of individuals without any due process—"taking" their private thoughts apparently has less value than a "taking" of their property. Under the majority's reasoning, no client's private information is safe from exposure, and no client can feel secure in the knowledge that their innermost thoughts and fears will remain sheltered from prying eyes. The consequences are far-reaching and beyond the majority's consideration.

Judge Raker authorizes me to state that she joins in this dissent.