932 A.2d 1225

**Alen J. SALERIAN**

**v.**

**MARYLAND STATE BOARD OF PHYSICIANS.**

**No. 624 Sept. Term 2006.**

Court of Special Appeals of Maryland.

Sept. 26, 2007.

232

234

Alen J. Salerian, pro se, Washington, DC (Paul T. Stein, Sperling, Bennett, DeJong, Driscoll & Greenfeig, PC, on the brief), Rockville, for Appellant.

Michael O'Doyle (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: MURPHY, C.J., KRAUSER, and BARBERA, JJ.

KRAUSER, Judge.

Appellant, Alen Salerian, M.D., a psychiatrist licensed in Maryland, was engaged by the defense in a federal espionage case to perform a forensic psychiatric evaluation of "Evaluee," the defendant in that case.[1] During the course of his engagement, appellant disclosed information that he had learned from Evaluee to Evaluee's wife and then, after he had been discharged by both Evaluee and his counsel, revealed this and other information about Evaluee to local, national, and international media outlets.

Attorneys for Evaluee and his wife thereafter filed a complaint against appellant with the Maryland State Board of Physicians ("Board"), appellee. After an investigation, the

---

1. The defendant is identified only as "Evaluee" by the Administrative Law Judge and the Maryland State Board of Physicians.

Board brought charges against appellant. A hearing followed, at the conclusion of which the Administrative Law Judge ("ALJ") issued a proposed decision finding appellant guilty of "immoral or unprofessional conduct in the practice of medicine," in violation of Maryland Code (1981, 2005 Repl.Vol., 2006 Supp.) § 14–404(a)(3) of the Health Occupations Article ("H.O."). She recommended that appellant's license b e revoked, that he be prohibited for a maximum of three years from applying for reinstatement, and that he be fined $20,000.

Adopting the ALJ's "findings," the Board concluded that appellant had violated H.O. § 14–404(a)(3), but declined to find that he "lack[ed] the good moral character necessary for the Board to approve reinstatement of his license." It therefore imposed a lesser sanction. It ordered, among other things, that appellant be placed on probation for a minimum of two years and fined $5,000, but indicated that its decision would not be "a bar to reinstatement of his license on moral character grounds. . . ."

After the Circuit Court for Montgomery County affirmed the Board's decision, appellant noted an appeal, claiming:

I. The Board did not recognize and apply the correct principles of law in finding it had jurisdiction to adjudicate and impose sanctions upon Dr. Salerian based on the complaint filed by the Attorney General.

II. The Board failed to recognize and apply the correct principles of law in finding that the term "unprofessional conduct" as alleged in the charging document is not valie [sic] for vagueness.

III. The Board did not apply the law correctly in finding that a forensic evaluation is the practice of medicine and, further, the facts were not substantial to determine that Dr. Salerian was conducting a forensic evaluation.

IV. The Board did not recognize and apply the correct principles of law in finding that the conduct alleged to be unethical occurred in the practice of medicine.

V. The Board did not have substantial evidence to find that Dr. Salerian's conduct was immoral and unprofessional

in the practice of medicine and the Board failed to apply the correct principles of law in finding that Dr. Salerian was in violation of the immoral and unprofessional conduct provision of the Maryland Practice [Act].

VI.   The Board failed to recognize and apply the correct principles of law regarding the fairness and due process to be accorded Dr. Salerian in the conduct of the hearing including the acceptance of testimony not given under oath, testimony not given under a proper oath, testimony not subject to full and complete cross-examination, refusal to allow depositions of [Evaluee] to be taken, refusal to allow the substitution of a witness on the issue of confidentiality, and not advising counsel that a decision to admit the testimony of [Evaluee] had been allowed.

VII.   The Board failed to recognize and apply the correct principles of law in finding that Dr. Salerian was an agent of Plato Cacheris.   [Evaluee's former attorney.]

VIII.   The Board failed to recognize and apply the correct principles of law in determining that the moral imperative exception to confidentiality was not justifiable in this matter.

IX.   The Board failed to recognize and correctly apply the law of waiver concerning [Evaluee's] assertion of breach of confidence.

X.   The Board did not correctly apply the principles of law when admitting the investigatory file in evidence.

For the reasons set forth below, we affirm the judgment of the circuit court.

## BACKGROUND

In February 2001, appellant wrote to attorney Plato Cacheris, who was then counsel for Evaluee, a former FBI employee charged with espionage. Appellant was eventually engaged by Cacheris, but, according to Cacheris, only for the limited purpose of performing a forensic psychiatric evaluation of Evaluee. He was to determine if Evaluee was competent to stand trial and whether a psychiatric defense was available.

Cacheris warned appellant that he was only authorized to disclose to the media that he had been engaged by the defense and nothing further.

Because of the "national security interests" that were involved in Evaluee's case, in March 2001, the United States Attorney General imposed "Special Administrative Measures" (SAM) of confinement on Evaluee "to prevent disclosure of classified information." The SAM restricted Evaluee's access to the media, mail, visitors, the telephone, and even limited his ability to communicate with his attorney. It further provided that only "the inmate's attorney, and not ... the attorney's staff" would be permitted to "disseminate the contents of the inmate's communications to third parties" and then, "for the sole purpose of preparing the inmate's defense—and not for any other reason...." Appellant signed a "Physician's Affirmation" stating that he had "received and read" the SAM conditions, and furthermore, that he was "the physician retained by defense counsel...."

Appellant visited Evaluee in prison seven days in late April and early May, for a total of ten hours and fifty minutes. According to appellant's notes, Evaluee disclosed to appellant what the Board described as his "long history of sexual betrayal and exploitation" of his wife,[2] which Evaluee had not, up til then, revealed to his wife. On May 4, 2001, appellant wrote a letter to Cacheris suggesting that Evaluee would benefit from pharmacotherapy.[3] One day later, appellant visited Evaluee and wrote him a prescription for *Paxil*, a medication for depression and anxiety.

On May 11, 2001, appellant disclosed to Cacheris what Evaluee had told him about his "sexual exploitation" of his

---

**2.** For example, unbeknownst to his wife, during the course of their marriage, Evaluee allowed his best friend to watch him and his wife engage in sexual intercourse through their bedroom window and through a hidden camera system he had set up for that purpose.

**3.** Pharmacotherapy is the "[t]reatment of disease through the use of drugs." The American Heritage Stedman's Medical Dictionary, 630 (2001).

wife. Cacheris instructed appellant not to reveal this information to anyone, including Evaluee's wife. Yet, one day later, appellant disclosed Evaluee's sexual activities to Evaluee's wife. He did so, appellant explained in a letter to Cacheris, to "engender enhanced understanding and reconcilment [sic] between [Evaluee] and his wife. . . ."

Four days later, on May 16, 2001, Cacheris wrote appellant a letter stating that Cacheris and the defense team had "permitted [appellant] to state publicly that [he] ha[d] been engaged by [the defense]" but reminding him that he "ha[d] also stated that [appellant] [was] not to disclose any confidences." "[E]verything," he instructed appellant, "falls within the attorney/client privilege and is not to be disclosed." He then "suggest[ed]" that appellant have "no further contact" with Evaluee and his family.

The next day, May 17, 2001, Cacheris met with appellant and gave him a letter terminating his services. The letter further instructed appellant that "all privileges and confidences remain intact and are inviolate," and "not . . . to discuss this matter with any other persons." That same day, Evaluee himself wrote a letter to appellant, asserting that he "no longer wish[ed]" appellant "to provide [him] with psychiatric services" and specifically instructing appellant "not to discuss this case or conversations you have had with me with anyone other than my attorneys." He concluded the letter by stating, "I am specifically forbidding you from discussing my case with any members of my family and certainly with anyone outside the family."

The next day, appellant wrote a letter to Cacheris "summariz[ing] [his] medical/psychiatric recommendations for [Evaluee]," including his opinion that Evaluee "responded very well to Paxil. . . ." Three days later, on May 21, 2001, appellant sent a letter to Cacheris, in which he stated that he "saw [himself] as a member of the [defense] team as soon as [he] began working" with Cacheris. He explained his disclosure of Evaluee's sexual activities to Evaluee's wife by stating that he

felt Evaluee could "better participate in his defense" if he was not "shackled by [the] guilt" of what he had done to his wife.

A week later, on May 30, 2001, appellant sent Cacheris the "psychiatric evaluation" of Evaluee that he had been engaged by Cacheris to perform. The evaluation concluded that Evaluee had been "suffering from several psychiatric disorders" and that there was "strong evidence for a possible insanity defense."

On June 12, 2001, Cacheris wrote to appellant, informing him that a producer for "Sixty Minutes" told Cacheris that appellant "had discussions with him concerning confidential matters involving [Evaluee]." Cacheris again warned appellant that appellant was "not permitted to disclose to anybody communications [he] may have had with [Evaluee] and members of his family" and that "any such disclosures will be violative of the attorney/client privilege and [appellant's] own canons of medical ethics prohibiting disclosures," and, furthermore, he reminded appellant that appellant signed the United States government's "Special Administrative Measures," which "prohibit public disclosures."

Evaluee also sent a letter to appellant, dated June 21, 2001, confirming "again" that he had not authorized appellant "to speak to anyone about [Evaluee] or [Evaluee's] case." Nonetheless, on numerous occasions appellant discussed Evaluee's psychological state with the media, which resulted in the publication of Evaluee's confidential statements to appellant.

## Board Investigation

On September 13, 2001, the Board received a complaint about appellant from the attorneys for Evaluee and his wife, alleging that appellant "was retained by [Evaluee's] legal defense team to perform a forensic evaluation on [Evaluee]" and that appellant had "disclosed confidential and privileged information without proper authorization." On November 21, 2001, the Board reviewed the case at its weekly review panel, which is a panel that reviews complaints "in light of the preliminary investigation" to decide if "further investigation"

is necessary. COMAR 10.32.02.03.A(2). After reviewing the complaint about appellant, the panel directed further investigation.

On September 30, 2001, appellant's license to practice medicine in Maryland expired. A year later, on September 11, 2002, appellant submitted an application for reinstatement of his medical license to the Maryland State Board of Physician Quality Assurance, now the Maryland State Board of Physicians ("Board").[4] Ultimately, the Board sent appellant a notice informing him of its intent to deny his "application for reinstatement of medical license" under the Maryland Medical Practice Act, H.O. § 14–401 *et seq.*

It further notified appellant that the Board was charging him with "immoral or unprofessional conduct in the practice of medicine," in violation of H.O. § 14–404(a)(3). The Board stated that appellant's conduct violated the "ethics of forensic psychiatry" because, among other things, he purportedly "entered into a treatment relationship with the Evaluee," "violated attorney-client and physician-patient confidentiality in the forensic setting," and "attempted to exploit, manipulate and coerce the Evaluee and the Evaluee's wife...." The notice further notified appellant that a hearing in this matter had been scheduled at the Office of Administrative Hearings ("OAH"), as well as a "case resolution conference" and a "prehearing conference."

In July 2003, appellant sent a letter to the Board asking it to withdraw his license application. The Board responded by informing appellant that an applicant cannot withdraw an application while charges are pending.

## ALJ Hearing

The issues before the ALJ were, as she put it, whether appellant "engaged in immoral or unprofessional conduct in the practice of medicine, in violation of [H.O.] § 14–404(a)(3),"

---

4. The Maryland State Board of Physicians was previously known as the "Maryland State Board of Physician Quality Assurance." The name change occurred in the middle of the proceedings in this case.

and whether appellant's "[a]pplication for [r]einstatement may be denied for such violations under [H.O.] § 14–205, and for not being of good moral character conduct in violation of [H.O.] § 14–307."

By the time the hearing was conducted, Evaluee had been convicted of espionage and was serving a life sentence in a federal prison in Colorado. Because of the restrictions imposed by his detention, he had to testify by telephone. At that time, he testified that he had agreed to let appellant disclose his sexual activities to his wife because appellant had told him that that information was already "in the hands of the media and would be revealed in the news media and that . . . he thought it would be better that she not hear it from the news media but that [appellant] were there and related it. . . ." Since he was not allowed to have any contact with the news media, he believed appellant's representation that the media was ready to publish this information.

At the hearings, the Board and appellant presented expert witnesses: Jeffrey S. Janofsky, M.D., testified for the Board and James R. Merikangas, M.D., testified for appellant. Both experts, the ALJ found, "agreed that psychiatrists are bound by the ethical standards set out in:" the American Academy of Psychiatry and the Law's Ethical Values in the Practice of Forensic Psychiatry ("AAPL"), American Psychiatric Association's Principles of Medical Ethics, and the American Medical Association's Principles of Medical Ethics.

Dr. Janofsky testified that forensic psychiatry is a subspecialty of psychiatry. But, in forensic psychiatry, he noted, the forensic evaluator is "retained" by the defense attorney and so he must follow that attorney's instructions. The forensic evaluator, he explained, "get[s] access to the defendant through the defense attorney [and is] instructed to answer the question by him and . . . send the information back to that defense attorney, and he's the one who . . . decides whether that information will go forward."

He asserted that, when performing a forensic psychiatric evaluation, in contrast to standard psychiatric treatment, the

forensic evaluator is not to treat the evaluee for psychiatric problems. His duty is only to make an objective diagnosis for the defense team within a legal context. Consequently, according to Janofsky, appellant's prescribing of medication for Evaluee was "absolutely . . . inappropriate," his disclosures to the media were a "gross breach of professionalism," and his revelation of Evaluee's sexual activities to Evaluee's wife was "a truly grotesque violation of forensic practice."

In reply, appellant called to the stand James R. Merikangas, M.D. Dr. Merikangas, a psychiatrist, testified that appellant's activities did not occur "in the practice of medicine" because forensic psychiatry is not the practice of medicine. He explained that the purpose of the "practice of medicine" is to treat a patient, and that is not the purpose of forensic psychiatry. He further stated that appellant was not engaged as a forensic evaluator because he "did not conduct and produce a report of the depth and type that is generally produced by forensic evaluators," nor was appellant treating Evaluee. Rather, according to Merikangas, appellant was conducting a "crisis management or an investigation as to what might be done" and therefore did not have a "confidential relationship" with Evaluee.

Appellant testified that he had "never promised to be a forensic psychiatrist to Plato Cacheris or anybody" and that he was to serve as the "crisis expert" or the "crisis doctor" for the defense, pointing out that he had previously performed such work for Cacheris. Appellant opined that he had an ethical duty to disclose the information Evaluee had conveyed to him to inform the public that the FBI had failed Evaluee by not taking Evaluee's "psychological behaviorial" incidents seriously; and that the Catholic institution, Opus Dei, of which Evaluee was a member, had failed Evaluee by not persuading Evaluee to "turn himself in" after Evaluee confessed to a priest that he had committed espionage.

Evaluee's wife testified that appellant "regular[ly]" told her that he "thought that someone, himself, should speak to the media to gain compassion and understanding and get [Evaluee] a lighter sentence." Because of appellant's "persistent

requests for a name" of a reporter he could talk to, she eventually gave him the name of someone she knew "occasionally" wrote for *The Washington Times,* to "make [appellant] happy," but she "knew that [the writer] wouldn't give [appellant] the time of day" and she had been assured by Cacheris that appellant "couldn't talk to the media. . . ." She said she "wasn't speaking to anybody" about Evaluee's case. She "didn't permit [her] attorney to and [she] didn't want any of [her friends]" to speak about it, and that "everyone who knew [her] kn[e]w [ ] that [she] did not want anybody speaking on [her] behalf or his behalf at all."

The ALJ issued her proposed decision on April 2, 2004. Opining that appellant was not "a credible witness," she found that appellant was engaged to conduct a forensic psychiatric evaluation of Evaluee and therefore had violated H.O. §§ 14–307 and 404(a)(3) by revealing confidential information he had obtained from Evaluee in the course of conducting that evaluation. She found that appellant disclosed Evaluee's confidential information to the "national and international press and media on multiple occasions, including CBS Evening News, the Associated Press, the BBC, The Washington Post, USA Today, and Sixty Minutes." She proposed (1) that appellant's "license to practice medicine in Maryland be revoked;" (2) that "his application for reinstatement be denied;" (3) that he "not be permitted to apply for reinstatement for a period not to exceed three years, and then only upon demonstration of his rehabilitated moral character;" and (4) that he "pay a monetary penalty not to exceed $20,000." Appellant filed exceptions to the proposed decision.

## Board's Decision

On January 4, 2005, the Board issued its final opinion and order, adopting the ALJ's "findings of fact" and "credibility findings" and incorporating by reference the ALJ's proposed decision into its final opinion and order. It further ordered that appellant's request to withdraw his application for reinstatement be denied, that he be reprimanded, that he be fined $5,000, and that he be placed on probation for a "minimum of two years, with no early termination of probation." The

probation period was not to expire until appellant "successfully completed an ethics course" at his expense. The Board stated that appellant's unprofessional conduct "will not act as a bar to reinstatement of his license on moral character grounds" and that he would not be precluded from seeking reinstatement to the practice of medicine in Maryland. That decision was thereafter affirmed by the circuit court.

## STANDARD OF REVIEW

"In reviewing a decision of an administrative agency, our role 'is precisely the same as that of the circuit court.'" *Grand Bel Manor Condominium v. Gancayco,* 167 Md.App. 471, 478, 893 A.2d 1144 (2006) (*quoting Dep't of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–04, 641 A.2d 899 (1994)). That is, "[w]e review only the decision of the administrative agency itself." *Gancayco,* 167 Md.App. at 478, 893 A.2d 1144 (citing *Ahalt v. Montgomery County,* 113 Md.App. 14, 20, 686 A.2d 683 (1996)). "We are limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions...." *Gancayco,* 167 Md.App. at 479, 893 A.2d 1144 (citations omitted). "[S]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Caucus Distributors, Inc. v. Maryland Sec. Comm'r,* 320 Md. 313, 324, 577 A.2d 783 (1990) (citation omitted). We also "determine if the administrative decision is premised upon an erroneous conclusion of law." *Gancayco,* 167 Md. App. at 479, 893 A.2d 1144 (citation omitted). However, "'the expertise of the agency in its own field should be respected.'" *Id.* (citation omitted). Therefore, "'an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts.'" *Id.* (citation omitted).

## DISCUSSION

### I.

Appellant first contends that the Board erred in finding that "it had jurisdiction to adjudicate and impose sanctions...."

He argues that because his license to practice medicine in Maryland expired on September 30, 2001, seven weeks before the Board opened its "investigation" on November 21, 2001, (the day that the Board's Weekly Review Panel met), he was not licensed in Maryland at the time the investigation was begun and therefore the Board lacked jurisdiction to sanction him in this matter. On the other hand, had the investigation begun before his license expired, his license would not have lapsed, as he maintains, on September 30, 2001, because H.O. § 14–403(a) provides that a "license, certification, or registration [may not] lapse by operation of law while the individual is under investigation or while charges are pending."

Although the Board's investigative summary says that appellant's case was "reviewed" at the Weekly Review Panel on November 21, 2001 and "open[ed] for investigation," a preliminary investigation of appellant was actually begun on September 13, 2001,[5] when the Board received the complaint. In fact, it is not the Panel's task to begin an investigation but, according to COMAR 10.32.02.03.A(2), to review a complaint "in light of the preliminary investigation" and to decide if "further investigation" is necessary. COMAR 10.32.02.03.-A(2). Since the investigation of appellant began on September 13, 2001, when the Board received the complaint about him, seventeen days before his license was due to expire on September 30, 2001, his license did not lapse on that date and the Board had jurisdiction to sanction him in this matter.

## II.

Appellant next argues that the Board erred in finding that the term "unprofessional conduct," as used in H.O. 14–404(a)(3), and as alleged in the charging document, is not void

---

5. The Board's Investigative Summary states that the complaint was received on September 21, 2001, but the ALJ found that it was received on September 13, 2001. The difference in dates is of no consequence here because, no matter on which date the Board received the complaint, the investigation of appellant still began before his license expired on September 30, 2001.

for vagueness. The Court of Appeals in *Finucan v. Maryland Board of Physician Quality Assurance*, 380 Md. 577, 846 A.2d 377 (2004), addressed this very issue. In that case, Finucan, a physician, "engaged in a series of inappropriate sexual relationships with at least three of his female patients while he was acting in his capacity as their treating physician." *Id.*, 380 Md. at 587, 846 A.2d 377. The Board found that Finucan's behavior was "unprofessional conduct in the practice of medicine" under H.O. § 14–404(a)(3), and it recommended that his license be revoked. *Id.* at 586–87, 846 A.2d 377. The circuit court agreed, and this matter wound its way up to the Court of Appeals. *Id.* at 588, 846 A.2d 377.

Before the Court of Appeals, Finucan claimed that "the prohibition of 'immoral or unprofessional conduct' contained in Maryland Code (1981, 2000 Repl.Vol., 2003 Supp.), § 14–404(a)(3) of the Health Occupations Article [was], on its face, unconstitutionally vague," because "the statute does not prohibit explicitly a physician from engaging in sexual relations with patients, nor fairly warn the physician that such conduct falls within its proscription." *Id.* at 591, 846 A.2d 377.

The Court of Appeals responded with the observation that "[t]erms such as 'unprofessional conduct' generally are sufficiently definite to withstand constitutional scrutiny if they are 'susceptible to common understanding by members of the [regulated] profession.'" *Id.* at 593, 846 A.2d 377 (citation omitted). Furthermore, "[t]he meaning of terms such as 'immoral conduct,'" it opined, "is determined by the 'common judgment' of the profession as found by the professional licensing board." *Id.* (citation omitted). "A statute prohibiting 'unprofessional conduct' or 'immoral conduct,' therefore, is not per se unconstitutionally vague," it explained, because "the term refers to 'conduct which breaches the rules or ethical code of a profession, or conduct which is unbecoming a member in good standing of a profession.'" *Id.* (citation omitted). Then, pointing out that the record "contain[ed] evidence that the prohibition against a physician engaging in sex with a current patient is commonly understood within the medical profession," *id.* at 594, 846 A.2d 377, the Court of Appeals

concluded that the circuit court did not err in finding that Finucan breached H.O. § 14–404(a)(3) by engaging in such a relationship with his patients. *Id.* at 596, 846 A.2d 377.

As in *Finucan,* the conduct at issue here—the prohibition against the disclosure of confidential communications—"is commonly understood within the medical profession." *See id.* at 594, 846 A.2d 377. The Principles of Medical Ethics of the American Medical Association ("AMA Guidelines"), which the Board describes as the "ethical codes of medicine in general"; The American Psychiatric Society's Annotations of the AMA Principles of Medical Ethics Especially Applicable to Psychiatry ("Psychiatry Annotations"), which, according to the Board, is the ethical code of "psychiatry as a specialty branch of medicine"; and The American Academy of Psychiatry and the Law's *Ethical Guidelines for the Practice of Forensic Psychiatry* ("AAPL"), which, in the words of the Board, is the ethical code of "forensic psychiatry as a sub-specialty of psychiatry," contain clear guidelines as to the duty of confidentiality.

The general AMA Guidelines state that a "physician shall . . . safeguard patient confidences within the constraints of the law." The Psychiatry Annotations state that "[p]sychiatric records, including even the identification of a person as a patient, must be protected with extreme care." Finally, the AAPL states that "[r]espect for the individual's right of privacy and the maintenance of confidentiality are major concerns of the psychiatrist performing forensic evaluations." Furthermore, the Board's expert witness, Dr. Janofsky, an expert in forensic psychiatry, testified that appellant's multiple disclosures of Evaluee's confidential statements violated these ethical standards.

■ Appellant nonetheless insists that COMAR 10.32.02. 10 renders H.O. § 14.404(a)(3) unconstitutionally vague by stating that "[t]he Board may consider the Principles of Ethics of the American Medical Association, but these principles are not binding on the Board." That statement, appellant asserts, makes it difficult for "a person of ordinary intelligence and experience" to have a "reasonable opportunity to know what

ethics or law the Board will be enforcing[.]" Appellant argues that the Board's reliance on not only the AMA Guidelines, but also on the Psychiatry Annotations and the AAPL in evaluating his conduct, contributed to the vagueness of H.O. § 14.404(a)(3). To the extent that appellant is arguing that the Psychiatry Annotations and the AAPL should not have been considered by the Board, he has waived that issue on appeal because he did not object to their introduction before the ALJ. We feel compelled to note, however, that even appellant's expert witness testified that all three canons of medical ethics apply to psychiatrists.

### III.

Appellant's next argument consists of two claims: that the Board erred "in finding that a forensic evaluation is the practice of medicine," and that "the facts were not substantial to determine that Dr. Salerian was conducting a forensic evaluation." We find no merit to either claim.

Appellant specifically argues that the Board erred in crediting the testimony of the State's expert witness, Dr. Janofsky, that conducting a forensic evaluation is the practice of medicine, and in rejecting the contrary testimony of appellant's expert witness, Dr. Merikangas.

In assessing this claim, we are guided by the principle that, "[w]hen two experts offer conflicting opinions, the trier of fact must evaluate the testimony of both experts and decide which opinion, if either, to accept." *Blaker v. State Bd. of Chiropractic Examiners*, 123 Md.App. 243, 259, 717 A.2d 964 (1998) (*citing Quinn v. Quinn*, 83 Md.App. 460, 470, 575 A.2d 764 (1990)). That is what the Board did here, and there is no basis for finding that it erred in crediting the testimony of Dr. Janofsky as to this issue rather than that of Dr. Merikangas.

Moreover, the AAPL states that "[f]orensic [p]sychiatry is a subspecialty of psychiatry, a medical specialty." In fact, one cannot be a member of the American Academy of Psychiatry and the Law without first being a member of the American

Psychiatric Association, a medical association, or its equivalent.

■ We further observe that the Board's interpretation of the provisions it administers is entitled to deference. *See Gancayco*, 167 Md.App. at 479, 893 A.2d 1144 (citations omitted). Citing H.O. § 14–101(*l*), the Board found that "[d]iagnosis of an emotional ailment, or a supposed ailment, is defined as the practice of medicine." In fact, that section defines to "[p]ractice medicine" as "to engage, with or without compensation, in medical: (i) Diagnosis; (ii) Healing; (iii) Treatment; or (iv) Surgery." H.O. § 14–101(*l*). It further "includes doing, undertaking, professing to do, and attempting any of the following: (i) Diagnosing, healing, treating, preventing, [or] prescribing for . . . ." H.O. § 14–101(1).

■ Appellant was retained by Cacheris to diagnose Evaluee. In fact, in the report appellant eventually submitted to Cacheris, appellant included some of his opinions under a heading entitled "FINAL DIAGNOSIS." Thus, we agree with the Board that a forensic evaluation is the practice of medicine. Moreover, appellant gave Evaluee a prescription for Paxil and was thus irrefragably practicing medicine.

Appellant also claims that "the facts were not substantial to determine that Dr. Salerian was conducting a forensic evaluation." But he makes this blanket assertion without any supporting argument and thus we shall not address it beyond quoting the Board's statement that appellant's argument that he was not performing a forensic evaluation "flies in the face of all of the evidence except his own testimony, which the [ALJ] found not credible both on this point and in general."

## IV.

Appellant claims that the Board erred "in finding that the conduct alleged to be unethical occurred in the practice of medicine." Specifically, he maintains that the Board erred in finding that appellant was "practicing medicine" when he disclosed Evaluee's confidential information to the media, be-

cause appellant was "no longer associated at all with [Cacheris'] team or [Evaluee] ... when [the] disclosures were made...." He further points out that "Dr. Janofsky testified that [Evaluee's] treatment ended when Dr. Salerian was discharged."

Appellant's ethical duty to maintain Evaluee's confidences did not end when appellant was terminated from the defense team on May 17, 2001. Dr. Janofsky testified that "in doctor-patient therapeutic relationships, the general standard is that you maintain confidentiality until the patient allows you to release it through consent" and that, in the forensic setting, the "psychiatrist maintains confidentiality to the extent possible given the legal context." [6] Yet, appellant breached this duty by not maintaining Evaluee's confidences after being terminated, even though Cacheris' letter of May 17, 2001, ending their relationship, clearly warned him that "disclosure of confidential communications would violate ethical rules and privilege laws."

Moreover, the Board cited numerous instances of appellant's unprofessional conduct that occurred while appellant was still engaged by Cacheris to conduct the forensic evaluation of Evaluee. Specifically, appellant "violated the boundaries of forensic psychiatry by prescribing an antidepressant for the Evaluee"; by "importuning the Evaluee to authorize him ... to reveal to Evaluee's wife [Evaluee's] long history of sexual betrayal and exploitation [of her]"; by "coerc[ing] the Evaluee's assent to this disclosure by stating to the Evaluee that the information was going to be printed or aired in the media anyway"; and by "attempt[ing] to obtain Evaluee's permission to reveal this information to the media."

Finally, to bolster his argument that his disclosures did not occur "in the practice of medicine," appellant cites *McDonnell*

---

6. This means that the "usual precepts of medical confidentiality" still apply but with "limitations" such as the disclosure the psychiatrist is expected to make to the Evaluee's attorney. In the forensic setting, the psychiatrist is required to give "notice to the evaluee of any limitations on confidentiality."

*v. Commission on Medical Discipline*, 301 Md. 426, 483 A.2d 76 (1984). In *McDonnell*, the Court of Appeals held that a physician that intimidated expert witnesses, who were to testify against him in a malpractice trial, by calling their medical colleagues and communicating to them his "intention of having transcripts of [the witnesses'] depositions disseminated to their local and national medical societies," *McDonnell*, 301 Md. at 428, 483 A.2d 76, did not engage in that conduct while "in the practice of medicine" because those actions were not "directly tied to the physician's conduct in the actual performance of the practice of medicine, i.e., in the diagnosis, care, or treatment of patients." *McDonnell*, 301 Md. at 437, 483 A.2d 76. In other words, the doctor's conduct "occurred during judicial proceedings against him based upon conduct constituting malpractice" but did not occur "in the workplace where he was present for the purpose of practicing medicine." *Cornfeld v. State Board of Physicians*, 174 Md. App. 456, 475, 921 A.2d 893 (2007) (citation omitted).

Fifteen years later, in *Board of Physician Quality Assurance v. Banks*, 354 Md. 59, 729 A.2d 376 (1999), the Court of Appeals upheld the Board's finding that a hospital physician who, while on duty in the hospital, sexually harassed other hospital employees who were attempting to perform their jobs, was "guilty of immoral or unprofessional conduct in the practice of medicine." *Id.* at 76–77, 729 A.2d 376. Relying on *Banks*, we recently asserted that "the touchstone for determining whether misconduct occurred 'in the practice of medicine' must be whether it was 'sufficiently intertwined with patient care' to pose a threat to patients or the medical profession." *Cornfeld*, 174 Md.App. at 474, 921 A.2d 893 (*citing Banks*, 354 Md. at 76–77, 729 A.2d 376).

Appellant's misconduct was, to be sure, " 'sufficiently intertwined with patient care' to pose a threat to patients or the medical profession." *Cornfeld*, 174 Md.App. at 474, 921 A.2d 893 (*citing Banks*, 354 Md. at 76–77, 729 A.2d 376). In fact, his conduct was more intertwined with patient care than Banks's conduct was. Whereas Banks's conduct was directed at hospital employees and thereby affected the medical profes-

sion but not patients themselves, appellant's acts—the disclosure of Evaluee's confidential communications—directly affected both. Appellant, as we previously noted, was treating Evaluee by prescribing Paxil and his disclosures also posed a threat to the medical profession by having, as the ALJ found, a "chilling effect on patients and potential patients alike" who should be "assured that information divulged to the psychiatrist, whether in the treatment or the forensic setting, will be held in utmost confidence." Thus, the Board did not err in finding that appellant's conduct occurred in the practice of medicine.

## V.

Appellant contends that the Board did no t have "substantial evidence" to find that his conduct was "immoral and unprofessional in the practice of medicine" and that he violated the immoral and unprofessional conduct provision of the Maryland Practice Act. Specifically, appellant claims that, although H.O. 14–404(a)(3) alleges "immoral **or** unprofessional conduct," the State, in its charging document, charged him with "immoral **and** unprofessional conduct in the practice of medicine, in violation of H.O. § 14–404(a)(3)." Thus the State had to prove, he asserts, that his conduct was both immoral and unprofessional, instead of simply unprofessional.

■■■ Appellant's argument has no merit. He was clearly charged under H.O. 14–404(a)(3), which unequivocally prohibits "immoral or unprofessional conduct. . . ." A typographical error in a charging document which otherwise correctly cites the relevant statute under which a doctor is charged is of no consequence.

## VI.

Appellant contends that the Board employed various procedures that violated "fairness and due process." Specifically, he argues: (1) that he sought a pre-trial deposition and/or video deposition of Evaluee and that the ALJ erred in not granting one because it had power to order it by ordering the

Administrative Prosecutor to Colorado to attend such a deposition; (2) that Evaluee's testimony by telephone was "so fraught with problems" that it "denied [a]ppellant a fair hearing"; (3) that Evaluee was not effectively under oath when he testified by telephone because the ALJ, who administered the oath, was sitting in Maryland and thus had "no statutory power to administer an oath to a person in Colorado"; (4) that his due process rights were violated by the introduction into evidence of the hearsay notes of the Board's investigator, Carol Palmer; (5) that his due process rights were violated by the ALJ's admitting into evidence the memo of Catherine Heuer, a former client of Cacheris; and (6) that his hearing was unfair because the ALJ refused to allow appellant to substitute a witness for a Washington Post writer who purportedly would have testified favorably for appellant.

First, appellant argues that the ALJ erred in denying him a pre-trial deposition and/or video deposition of Evaluee, but he cites no authority in support of this position. Discovery in cases before the Board is governed by COMAR 10.32.02.03E.(3) and (4) which permit only limited discovery of such things as witness lists and statements of expert opinions. Beyond that, discovery is not permitted. COMAR 10.32.02.03E(5) ("Parties are not entitled to discovery of items other than as listed in § E(3) and (4) of this regulation."). Because § E(3) and (4) do not list depositions, the ALJ did not err in denying appellant's request.

In any event, Evaluee testified by phone, which given the security arrangement put in effect by the federal government, was the only way Evaluee could testify at all and appellant had, at that time, the opportunity to cross-examine him.

Second, appellant argues that Evaluee's testimony by telephone was "so fraught with problems" that it "denied [a]ppellant a fair hearing." Evaluee's telephonic testimony was subject to federal government restrictions. The telephone connection with Evaluee could be sustained only for fifteen minutes at a time, at which point the connection was dropped

and had to be reconnected. In addition, there were points at which Evaluee could not be heard clearly. After hearing argument on the admissibility of Evaluee's telephonic testimony, the ALJ ruled that she would not consider it because she did not have the "confidence that the record would be clear and complete...."

When the Board's counsel requested that the ALJ reconsider her decision to strike Evaluee's entire testimony, the ALJ reviewed her notes and the transcript of Evaluee's testimony. She found that "although the Evaluee was asked to repeat his responses multiple times throughout, his answers were ultimately repeated, heard, and reported." She found that appellant had a "full and fair opportunity to cross examine the Evaluee, via telephone, and had every opportunity to request that the Evaluee repeat his responses to the satisfaction of Counsel." The ALJ reversed her earlier decision and held quite properly that, in accordance with these findings, she would consider the telephonic testimony.

Moreover, Evaluee's testimony was corroborated by other witnesses who testified in person at the hearing, including Cacheris and Evaluee's wife, and by documents introduced into evidence, such as Evaluee's letter instructing appellant not to disclose his confidences. There was thus substantial evidence in the record independent of Evaluee's telephonic testimony to support the Board's findings.

Third, appellant argues that Evaluee was not effectively under oath when he testified by telephone because the ALJ, who administered the oath, was sitting in Maryland and thus had "no statutory power to administer an oath to a person in Colorado." Appellant cites no authority in support of this thesis.

▇ The ALJ ruled that she had the power "to conduct all or part of hearings by telephone" under the Board's "rules of procedure," that "authorization carries with it the power for [her] to swear in witnesses that are going to testify by telephone," and that there is "no limitation under those rules about whether or not the person has to be present in the state

of Maryland in order for the oath to be effective." We see no error of law in her conclusion. In any case, as we stated earlier, there was substantial evidence in the record to corroborate Evaluee's testimony that appellant acted unprofessionally in the practice of medicine.

▮▮▮▮▮▮ Fourth, appellant argues that his due process rights were violated by the introduction into evidence of the notes of the Board's investigator, Carol Palmer, who accompanied the administrative prosecutor to a meeting with Evaluee while he was incarcerated in Virginia. He argues that the notes were hearsay. But "it is well settled in Maryland that hearsay evidence is admissible into evidence at administrative hearings." *Eichberg v. Maryland Bd. of Pharmacy*, 50 Md. App. 189, 193, 436 A.2d 525 (1981). Furthermore, appellant cross-examined Palmer about the notes, and he also cross-examined Evaluee, who purportedly made the statements contained in the notes. Appellant's argument is therefore unpersuasive.

Fifth, appellant claims that his due process rights were violated by the ALJ's admitting into evidence the memo of Catherine Heuer, a former client of Cacheris, who called him apparently to complain about appellant. He argues that he could not properly cross-examine Heuer because he had represented her in the past on another matter. However, Heuer was not on the witness stand; Cacheris was, attempting to speak about a conversation he had with Heuer in which she told him appellant had disclosed to her information about Evaluee. In any event, as the Board notes, Heuer's allegation against appellant "played no role in the ALJ's or the Board's decision." The Board specifically found that appellant's disclosure of Evaluee's mental state to Heuer, though "significant," did not "have any effect on the Board's ultimate conclusion, or on the sanction. . . ."

Sixth, appellant argues that his hearing was unfair because the ALJ refused to allow appellant to "substitute one witness" with a Washington Post writer. Before the ALJ, appellant proffered that the reporter in question contacted appellant for

material on Evaluee and that appellant refused to provide any information beyond the fact that he was involved as a forensic evaluator. It is difficult to see how this testimony is of any material consequence as appellant further proffered that the reporter would testify that this phone call occurred before Evaluee purportedly gave appellant his consent to disclose information to the media.

Moreover, as we previously noted, there was ample evidence that appellant had been instructed by Cacheris and Evaluee not to disclose any information to the media except to inform them that he had been engaged by the defense. And Dr. Janofsky opined that, even if Evaluee had given appellant consent to use media contacts, appellant's proper course of action as a forensic evaluator would be to consult with Cacheris before making any statements to the media.

## VII.

Appellant contends that the Board erred in "finding that [he] was an agent of Plato Cacheris." He argues that he was a "crisis manager" for Evaluee, not a forensic evaluator for Cacheris. And thus, his disclosure of Evaluee's sexual activities to Evaluee's wife, his Paxil prescription, and his statements to the press—all of which he asserts were consented to by appellant—were consistent with his role as Evaluee's "crisis manager."

However, the Board's finding that appellant was engaged as a forensic evaluator was supported by substantial evidence, as we discussed earlier in this opinion. We reiterate that Dr. Janofsky testified that appellant's assignment was a "typical" one for a forensic evaluator, that Cacheris testified that he engaged appellant to render an opinion as to whether Evaluee had any viable psychiatric defenses, that appellant himself produced the forensic psychiatric report answering the very questions Cacheris posed to him, and finally, that appellant signed the government's SAM agreement spelling out that the information he obtained could be used, as the Board found, "only in preparation for the defense of the accused."

## VIII.

■ Appellant claims that the Board erred in "finding that the moral imperative exception to confidentiality was not justifiable in this matter." He argues that the AMA Ethical Guidelines create an exception to a physician's duty not to disclose confidential communications that can be invoked "to protect the welfare of the individual or the public interest." He says he "exercised the imperative, morally, to speak out in the interest of the community out of the grave concern for the community's safety." The public interest, according to appellant, was the "failure of the FBI, the Catholic Church, and the medical profession to fulfill [their] obligations," that is, to provide Evaluee with needed "therapeutic intervention." He asserts that the Catholic Church failed to recommend Evaluee for treatment even though Evaluee, a Catholic, confessed his sexual activities and his espionage activities to Catholic priests; and the medical community, which treated Evaluee for migraine headaches, "did nothing to determine the underlying issues." Appellant believed these institutions needed reform and, as he testified during the hearing, he followed an ethic that was "bigger than forensic psychiatry," and he "listen[ed] to [his] heart and ... d[id] what [he] believe[d] [wa]s right."

Appellant cites no authority for his argument that under such circumstances, a forensic evaluator, or even a treating psychiatrist, may disclose an evaluee's confidential information to promote institutional reform. The seminal case defining a mental health expert's duty to disclose a patient's confidential information to a third party is *Tarasoff v. Regents of the University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). In that case, a patient told his therapist that he was going to kill Tatiana Tarasoff, and he subsequently did. *Tarasoff*, 17 Cal.3d at 430, 131 Cal.Rptr. 14, 551 P.2d 334. The California court held that the therapists could be liable for not warning Tarasoff, stating that "the therapist's obligations to his patient require that he not disclose a confidence unless such disclosure is necessary to avert danger to others," and, even then, that "he do so discreetly, and in a fashion that

would preserve the privacy of his patient to the fullest extent compatible with the prevention of the threatened danger." *Id.* at 441, 131 Cal.Rptr. 14, 551 P.2d 334.

In contrast, Evaluee obviously did not pose a threat or danger to the public at the time of appellant's disclosures; nor does appellant contend otherwise. Furthermore, Dr. Janofsky testified that he was familiar with the *Tarasoff* case. When asked by the State during the hearing if he knew of the "public interest" or "community interest" exception to "patient confidentiality in a criminal forensic setting," he testified that "[i]t simply doesn't exist" and that he knew of "no exception in the literature, either the legal or in the psychiatric or the forensic psychiatric literature, of such an exception."

Relying on *Tarasoff* and Dr. Janofsky's opinion, the ALJ found, as did the Board, that there was no "moral imperative" or community interest exception to appellant's duty to maintain Evaluee's confidences. We agree and find no error.

## IX.

Appellant contends that the Board erred in its application of "the law of waiver concerning [Evaluee's] assertion of breach of confidence." Specifically, he maintains that "[a] communication can be confidential and receive legal protection only so long as the one who holds the privilege . . . keeps the confidence himself," and that, because Evaluee had posted stories about the sexual exploitation of his wife on the Internet prior to meeting appellant, the information was "clearly [not] confidential or protected by privilege."

Appellant confuses "privilege" and "confidentiality." "Privilege statutes must be narrowly construed," as "[p]rivilege is the legal protection given to certain communications and relationships, *i.e.*, attorney-client privilege. . . ." *Doe v. Maryland Bd. of Social Workers,* 154 Md.App. 520, 528, 840 A.2d 744, *aff'd,* 384 Md. 161, 862 A.2d 996 (2004) (citations omitted). "[P]rivileges provide for an environment in which open communication can occur without the fear that the communication will later be used in a court or administrative

proceeding against the person making the communication."
*Doe,* 384 Md. at 170, 862 A.2d 996. Confidentiality, on the
other hand, is broader than privilege. *See id.* at 171, 862 A.2d
996. Thus, information that is not protected by a privilege
statute can still be confidential information. *Doe,* 154 Md.
App. at 528, 840 A.2d 744.

As the Board stated, Evaluee is not trying to prevent
appellant from using his communications against him in a
court or administrative proceeding. Thus, the cases appellant
cites in support of his argument, notably, *In re Alethea W.,*
130 Md.App. 635, 747 A.2d 736 (2000); *Reynolds v. State,* 98
Md.App. 348, 633 A.2d 455 (1993); and *Hamilton v. Verdow,*
287 Md. 544, 414 A.2d 914 (1980), are not applicable to the
case at bar because those cases dealt with the waiver of
privileged information in court proceedings. In the instant
case, privilege does not apply, but confidentiality does.

The Board also found that simply because some of the
information Evaluee disclosed to appellant was already avail-
able to the public does not mean appellant's duty to keep the
information confidential was waived in any way. This finding
by the Board was supported by the ethical guidelines admitted
into evidence and by Dr. Janofsky, who testified that it would
have made "no difference" if the information was already
released to the press before appellant released it himself.

## X.

Finally, appellant claims that the Board erred in admitting
into evidence letters in the investigatory file from Steven
Salky, Evaluee's attorney at the time of the hearing, because
the letters were hearsay. As we stated earlier, "it is well
settled in Maryland that hearsay evidence is admissible into
evidence at administrative hearings." *Eichberg,* 50 Md.App.
at 193, 436 A.2d 525.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY
APPELLANT.**